**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TONY PEEBLES, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:16-cv-02550 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 2). Cross-motions for summary judgment have been filed by Plaintiff Tony Peebles ("Plaintiff," "Peebles") and by Defendant Nancy A. Berryhill ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff, Tony Peebles' Motion for Summary Judgment, Docket Entry #14, Plaintiff Tony Peebles' Brief in Support of Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #15; Defendant's Cross Motion for Summary Judgment, Docket Entry #16, Memorandum in Support of Defendant's Cross Motion for Summary Judgment, ["Defendant's Motion"], Docket Entry #16). Defendant has filed a response to Plaintiff's motion. (Defendant's Response to Plaintiff's Motion for Summary Judgment, Docket Entry #18). After considering the pleadings, the evidence submitted, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion be **GRANTED**, and that Defendant's motion be **DENIED**.

**Background**

On August 17, 2011, Plaintiff filed applications for both Supplemental Security Income ("SSI") benefits, under Title XVI of the Social Security Act ("the Act"), and for Social Security Disability Insurance Benefits ("DIB") under Title II of the Act. (Transcript ["Tr."] at 174-94). In his applications, Plaintiff claimed that he had been unable to work since July 15, 2011, due to diabetes, coronary artery disease, chronic obstructive pulmonary disease, and high blood pressure. (Tr. at 174, 235). The SSA denied Plaintiff's applications on November 22, 2011, finding that he is not disabled under the Act. (Tr. at 60-62). Plaintiff petitioned for a reconsideration of that decision, but his applications were again denied, on February 9, 2012. (Tr. at 63-65, 78-92).

On March 5, 2012, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. at 48, 93). Such a hearing, before ALJ Daniel Whitney, took place on April 21, 2014.[1] (Tr. at 28-59). Plaintiff appeared with his attorney, Denotra Stewart, and he testified in his own behalf. (Tr. 12, 32-53.). The ALJ also heard testimony from a vocational expert witness, Norman Hooge ("Mr. Hooge"). (Tr. at 35-36, 53-58). No medical expert testified at the hearing.

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

> 1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R.

---

[1] Initially, Plaintiff's hearing had been scheduled for June 27, 2013, however, Peebles did not appear on that date. (Tr. at 12). The ALJ found that Plaintiff had not submitted an acceptable reason for failing to appear, and dismissed his hearing request. (Tr. at 12, 66, 69-70). On October 22, 2013, Peebles submitted evidence to the Appeals Council, which showed that he had been incarcerated from October, 2012, to September, 2013, and that he had not received notice of the hearing. (Tr. at 12, 72-73, 136-37, 207-08). For that reason, the Appeals Council found that Peebles had a good reason for failing to appear, and remanded his claims to the ALJ for evaluation. (Tr. at 12, 72).

§§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Peebles has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340,

343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[]he is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Peebles has "coronary artery disease, diabetes mellitus, hypertension, and chronic obstructive pulmonary disease (COPD)[.]"[2] (Tr. at 15). Although he determined that these impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA

---

[2]"Chronic obstructive pulmonary disease" is a progressive and irreversible condition characterized by diminished inspiratory and expiratory capacity of the lungs. The person complains of dyspnea with physical exertion, difficulty in inhaling or exhaling deeply, and, sometimes, a chronic cough. The condition includes chronic bronchitis, pulmonary emphysema, asthma, or chronic bronchiectasis and is aggravated by cigarette smoking and air pollution. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 338 (5th ed. 1998).

regulations. (Tr. at 15). He also found that Plaintiff's medically determinable hyperlipidemia,[3] gynecomastia,[4] and peripheral vascular disease[5] are not severe impairments, because the medical records show that those conditions did not significantly limit Plaintiff's ability to perform work. (*Id.*). The ALJ then assessed Peebles' residual functional capacity ("RFC"), and found that:

> The claimant has the [RFC] to perform light work[,] as defined in 20 CFR [§§] 404.1567(b) and 416.967(b)[, with an ability] to sit[] for 6 hours in an 8-hour workday; stand[] and/or walk[] for a total of 6 hours in an 8-hour workday; and lift[] and/or carry[] 20 pounds occasionally and 10 pounds frequently. Additionally, the claimant must avoid dust, fumes, odors, and pulmonary irritants.

 (Tr. at 16). Further, the ALJ found that, even though Peebles cannot return to his previous work as a truck driver, he has the residual functional capacity to perform other work that is available in the national economy. (Tr. at 23-24). On that matter, he found that Peebles' driving skills can be transferred to jobs within his residual functional capacity. (Tr. at 20). The ALJ determined that Peebles is able to perform work as a "delivery car rental driver." (*Id.*). He also found that a significant number of these jobs are available in the economy, and so, he concluded that Peebles is "not under a 'disability,' as defined in the Social Security Act, from July 15, 2011, through the date of [his] decision." (Tr. at 21). The ALJ then denied his applications for benefits. (*Id.*).

On October 22, 2013, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 136-37). SSA regulations provide that the Appeals Council will grant a request for a review

---

[3]"Hyperlipidemia" is an excess of lipids, including glycolipids, lipoproteins, and phospholipids, in the plasma. *Id.* at 791.

[4]"Gynecomastia" is an abnormal enlargement of one or both breasts in men. Milk production may or may not be present. The condition is usually temporary and benign. It may be caused by hormonal imbalance, tumor of the testis, or pituitary, use of medication that contains estrogens or steroidal compounds, or failure of the liver to inactivate circulating estrogen, as in alcoholic cirrhosis. *Id.* at 720.

[5]"Peripheral vascular disease" is any abnormal condition that affects the blood vessels outside of the heart and the lymphatic vessels. Peripheral symptoms include numbness, pain, pallor, elevated blood pressure, and impaired arterial pulsations. *Id.* at 1241.

if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On December 6, 2015, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed. (Tr. at 1-6). With that ruling, the ALJ's findings became final. On June 28, 2005, Peebles filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the ALJ's decision. (Plaintiff's Complaint ["Complaint"], Docket Entry # 1). Having considered the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion for summary judgment be GRANTED, and that be Defendant's cross-motion be DENIED.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this

determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

In his motion, Plaintiff claims that the ALJ erred, at step five of his analysis, because he did not appropriately evaluate whether his commercial driving skills are transferrable to other work that exists in the national economy. (Plaintiff's Motion at 5). He argues, specifically, that "driving" is not a transferable skill. (*Id.* at 6-9). Peebles contends further that, even if "driving" is a transferable skill, he can no longer serve as a commercial driver, due to his diabetes. (*Id*. at 7-9). He insists that, had the ALJ determined that he has no transferable skills, he would have been found disabled under the Medical Vocational-Guidelines. (*Id*. at 5-6). Peebles also contends that the ALJ erred, because he failed to determine whether his job skills could be transferred with "little or no adjustment in terms of tools, work processes, work settings, or industry." (*Id*. at 10-11). Plaintiff is adamant that he was prejudiced as a result of the ALJ's insufficient inquiry on that issue. (*Id*. at 11-15). Defendant, on the other hand, maintains that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled. (Defendant's Motion at 3-5; Defendant's Response at 1-4).

### *Medical Facts, Opinions, and Diagnoses*

The earliest available evidence shows that, on February 1, 2007, Plaintiff appeared at Jack

C. Montgomery VA Medical Center ["VAMC"] with complaints of numbness in his feet. (Tr. at 424). He denied experiencing any other pain or discomfort. (Tr. at 427). Peebles explained that the numbness typically occurs after he had been driving for four hours. (Tr. at 422). He reported that he had been diagnosed with diabetes, but was not taking any medication for that condition. (Tr. at 422, 424). Plaintiff said that, in 1991, he had been hospitalized with pneumonia, and that he had been exposed to agent orange during the Vietnam War. (Tr. at 422, 423). The doctor observed that Peebles' lungs were clear, and that his respiratory effort was normal. His gait and mood were normal, as well. (Tr at 423). Plaintiff was counseled on insulin administration, low impact exercise, and nutrition. (Tr. at 427-28). He was also given pneumonia and flu vaccines. (Tr. at 428-29).

On February 8, 2007, Plaintiff returned to the VAMC for a routine check of his blood sugar and cholesterol levels. (Tr. at 442). He was diagnosed as suffering from tobacco abuse disorder and depression. (*See* Tr. at 359-60). On that date, the doctor reviewed the renal, cardiac, ocular, and pedal symptoms of Peebles' diabetes, and, finding no abnormalities, instructed him to return in three months. (Tr. at 443, 444). He also recommended that Plaintiff see an opthalmologist and a nutritionist. (Tr. at 444).

On June 21, 2007, Peebles had an assessment of his diabetes, hypertension, and hyperlipidemia. (*See* Tr. at 463-67). He reported that he had been suffering from a cough and a fever, but that his symptoms appeared to be subsiding. (Tr. at 463). The doctor noted that Plaintiff had a normal gait and equal bilateral patellar reflexes, as well as normal respiratory and psychiatric function. (Tr. at 464). He warned Peebles that he had a high risk of developing coronary artery disease, and discussed options for mitigating those risk factors. (*Id*.). On that date, Plaintiff was

diagnosed as suffering from hypertension and hypercholesterolemia.[6] (Tr. at 358-59). He was instructed to return to the clinic in six months. (Tr. at 464).

On February 20, 2008, Peebles told the VAMC physician that he had "r[u]n out of [his] med[ication][,][7] and [that he] did not [know how] to refill [them.]" (Tr. at 452). He denied experiencing any generalized weakness, chest pain with exertion, or myalgias.[8] (*Id*.). A physical exam revealed no abnormalities. (Tr. at 452-54). Peebles was referred to a tobacco cessation clinic, and instructed to schedule another appointment in three months. (Tr. at 453).

On October 17, 2008, Peebles was given follow-up treatment regarding a stent placement that he underwent on September 22, 2008. (Tr. at 317, 344, 468-74). Plaintiff was alert and cooperative. (Tr. at 471). The doctor also observed that Peebles was able to walk without assistance. (*Id*.). Plaintiff admitted, however, that he had not been monitoring his diet, and that he had been eating sugary foods frequently. (Tr. at 468, 469). He also admitted that he had not been taking his anti-diabetic medication, as prescribed. (Tr. at 471). On that date, Peebles was diagnosed as suffering from coronary artery disease, referred to a dietician, and instructed to return in three months. (Tr. at 357-58, 469).

On February 25, 2009, Peebles sought additional treatment at the VAMC for hyperlipidemia, hypertension, and coronary artery disease. (Tr. at 404-07, 458-62). Plaintiff said that he had been "feel[ing] down" since the deaths of his mother-in-law and brother. (Tr. at 404, 458). The doctor

---

[6]"Hypercholesterolemia" is a condition in which greater than normal amounts of cholesterol are present in the blood. *Id.* at 789.

[7]Plaintiff did not specify that medication. (*See* Tr. at 452). However, the record shows that, on that date, he sought treatment at the VAMC for diabetes, hypertension, and hyperlipidemia. (Tr. at 452-57).

[8]"Myalgia" is diffuse muscle pain, usually accompanied by malaise. MOSBY'S, at 1065.

found that Peebles' lung sounds were normal, and he was in no distress. (Tr. at 405, 459). However, his A1C[9] and glucose levels were elevated. (Tr. at 405, 459). The doctor prescribed Zoloft, to treat Peebles' depressive symptoms, advised him to stop smoking, and emphasized the importance of diet, exercise, and salt restriction. (Tr. at 406, 460). He also instructed him to return in six weeks. (Tr. at 406, 460).

On May 7, 2009, Peebles went to the VAMC, complaining of chest pain, which radiated into his left arm. (Tr. at 430). He was transferred to the emergency department at St. John Health System ["St. John"], where he also complained of generalized weakness, dyspnea,[10] mild wheezing, and a cough. (Tr. at 309-21, 316, 338-51). Peebles described the pain as "dull," and "constant," and he rated it as a "four," on a scale of "one to ten." (Tr. at 340, 344). Plaintiff denied experiencing any muscular tenderness or genitourinary symptoms. (Tr. at 340). He admitted that he smoked one and a half packs of cigarettes, daily, and that he had been diagnosed with COPD. (Tr. at 316). The nurse noted that Peebles had normal breath and heart sounds, and that his abdomen was soft and round. (Tr. at 340, 344). A chest x-ray revealed a normal heart size. (Tr. at 321). There was no evidence of inflitrates, effusion,[11] or interval change. (*Id.*). Ultimately, he was diagnosed as suffering from angina.[12] (Tr. at 339, 344). Nitrogylcerin was administered, and his symptoms subsided. (Tr. at 338,

---

[9]The "A1C test" is a blood test that provides information about an individual's average levels of blood glucose over the past three months. THE NATIONAL INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES, https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test (last visited July 10, 2017).

[10]"Dyspnea" is a distressful sensation of uncomfortable breathing that may be caused by certain heart conditions, strenuous exercise, or anxiety. MOSBY'S, at 527.

[11]"Effusion" is the escape of fluid, for example, from blood vessels as a result of rupture or seepage, usually into a body cavity. *Id.* at 537.

[12]"Angina" is a term used to describe cardiac pain caused by the absence of oxygen in the myocardium. *Id.* at 89.

344).

On May 8, 2009, Plaintiff returned to the VAMC to undergo a series of cardiovascular tests. (Tr. at 327-37). A cardiologist performed a left heart catheterization with a ventriculography,[13] a left and right coronary angiography,[14] and "hemostasis[15] with Boomerang." (Tr. at 327). Those tests revealed moderate, two-vessel coronary artery disease, and moderate anterolateral hypokinesis.[16] However, Peebles' ventricular function was normal, overall. (*Id*.). He also underwent an electrocardiogram ["EKG"], which returned normal results. (Tr. at 481). Peebles was diagnosed as suffering from angina and myocardial infarction. (Tr. at 327). He was instructed to continue using a beta blocker, nitroglycerin, and Plavix, and to undergo another EKG. (Tr. at 312, 317). He was also instructed to stop smoking, and to seek follow-up treatment in two to three weeks. (Tr. at 327).

On February 16, 2010, Peebles returned to the VAMC, and reported that he had been feeling "fairly well." (Tr. at 395, 446). He did complain of a dull, continuous pain in his left shoulder and elbow, however. (Tr. at 395, 398, 446, 449). Peebles rated the pain as an "eight," on a scale of "one to ten." (Tr. at 398). He said that he had taken Tylenol, but that it did not provide any relief. (Tr. at 395, 446). Peebles denied experiencing any chest pain, palpitations, dyspnea, or cough. (Tr. at 395-96, 446-47). The doctor recommended several pain management options, including ice and heat

---

[13]A "ventriculography" is the radiographic examination of a ventricle of the heart after injection of a radiopaque contrast medium. *Id.* at 1704.

[14]An "angiography" is the x-ray visualization of the internal anatomy of the heart and blood vessels after the intravascular introduction of a radiopaque contrast medium. The procedure is used as a diagnostic aid in myocardial infarction, vascular occlusion, calcified atherosclerotic plaques, cerebrovascular accident, portal hypertension, renal neoplasms, renal artery stenosis, and as a causative factor in hypertension, pulmonary emboli, and congenital and acquired lesions of pulmonary vessels. *Id.* at 90.

[15]"Hemostasis" is the termination of bleeding by mechanical or chemical means, or by the complex coagulation process of the body. *Id.* at 750.

[16]"Hypokinesis" is the diminished power of movement or motor function, which may or may not be accompanied by a mild form of paralysis. *Id.* at 800.

therapy, imagery, deep breathing, and massage. (Tr. at 398, 449). He noted that Plaintiff's coronary artery disease and hypertension were controlled. (Tr. at 396, 447). However, Peebles' diabetes and hypercholesterolemia were not under control, because he had not been compliant with his medication. (*Id.*). Plaintiff claimed that his medication had been stolen, and that he had "not taken any of his medications for a month[.]" (Tr. at 395, 396, 446, 447). Peebles later reported that he continued to smoke one pack of cigarettes, per day. (Tr. at 400, 451). Plaintiff's prescriptions were renewed, and ordered to be sent to him by certified mail. (Tr. at 396, 447). He was also advised to quit smoking. (Tr. at 400, 451).

On September 21, 2010, Plaintiff returned to the VAMC for a follow-up appointment. (Tr. at 388-89). He denied experiencing any chest pain, dyspnea, cough, or abdominal pain. (Tr. at 388, 389, 475, 476). The doctor noticed that Plaintiff's blood sugar level had improved, as a result of taking his medication as prescribed. (Tr. at 389, 475, 476). He also observed that Peebles was able to walk without any assistance. (Tr. at 475). His hypertension and coronary artery disease were controlled, as well. However, Plaintiff's hypercholesterolemia was not under control, because he had again been non-compliant with his medication. (Tr. at 389, 476). He later received a skin risk screen, and was educated on the importance of diabetic foot care. (Tr. at 390, 478). Peebles was advised to decrease his intake of fats, salt, and simple sugars, and to participate in regular exercise. (Tr. at 389, 476).

On August 23, 2011, Plaintiff had another appointment at the VAMC. (Tr. at 380-84). He stated that he believed that his cholesterol level was high, but that he had been taking his medication correctly, and walking for exercise. (Tr. at 380-81). He also complained of constant pain in his right arm. (Tr. at 384). Peebles described the pain as "tingling," and rated it as a "six," on a scale of "one

to ten." (*Id.*). Plaintiff was screened for post traumatic stress disorder, depression, and alcoholism. (Tr. at 380-81). Each screen returned negative results. (*Id.*). He was also given a diabetic foot exam, which revealed no abnormalities. (Tr. at 383). The doctor determined that Plaintiff was not obese, but that he was nutritionally impaired. (Tr. at 382-83).

On October 8, 2011, Peebles was examined by Dr. Traci Carney, D.O. ["Dr. Carney"], a family medicine physician acting on behalf of the state. (Tr. at 496-99). Peebles complained to Dr. Carney of low circulation in his legs and difficulty in breathing. (Tr. at 496 ). He reported that he is short of breath "all [of] the time[,]" and that he had been diagnosed as suffering from COPD. (*Id.*). He said that his doctor recommended that he use an inhaler to treat his condition. Plaintiff also stated that he had survived two heart attacks, and that a stent had been placed in his chest. He denied experiencing any chest pain. (*Id.*). Peebles told Dr. Carney that he had been suffering from diabetes for ten years, and that his blood sugar level is not under control. (*Id.*). He added that he had been experiencing weight loss, fatigue, weakness, a runny nose, dyspnea on exertion, and wheezing. (Tr. at 496-97). Dr. Carney found Peebles to be "cooperative, conversant, well kept, properly nourished, and not in any acute distress." (Tr. at 497). She observed decreased breath sounds, with scant wheezing. She noted no cardiac, abdominal, musculoskeletal, or neurologic impairments. (Tr. at 498). She also found that his gait was safe and stable. (*Id.*). Ultimately, Dr. Carney  diagnosed Peebles as suffering from COPD, by history, tobacco abuse, coronary artery disease, hyperlipidemia, diabetes mellitus type II, uncontrolled, hypertension, gynecomastia, and peripheral vascular disease. (Tr. at 498-99). She recommended that Plaintiff undergo a pulmonary function test to assess his COPD. (*Id.*). On November 9, 2011, Peebles underwent a series of pulmonary function studies, which revealed normal lung function. (Tr. at 532-38).

Peebles was also evaluated by Dr. Walter Bell ("Dr. Bell"), on behalf of the state. (Tr. at 505-12). On November 22, 2011, Dr. Bell determined that Peebles could lift and carry 25 pound items frequently, and 50 pound items occasionally; that he could stand or walk for up to 6 hours in an 8-hour work day; that he could sit for about 6 hours in an 8-hour work day; that he could push and pull items weighing up to 50 pounds; and that he had no postural, manipulative, visual, or communicative limitations. (Tr. at 506-09). Finally, Dr. Bell found that Plaintiff should avoid work environments which permitted moderate exposure to fumes, odors, dusts, gases, or that have poor ventilation systems. (Tr. at 509). On February 9, 2012, that physical residual functional capacity assessment was affirmed, as written, by Dr. Karl Boatman ["Dr. Boatman"], a general surgeon retained by the state. (Tr. at 539).

Plaintiff had a follow-up appointment at the VAMC on April 18, 2012. (Tr. at 556-61). He reported, again, that he had been feeling "fairly well[,]" since his last visit. (Tr. at 557). He complained that he had been suffering from worsening dyspnea on exertion, and a chronic, unproductive cough. He stated that he had not experienced dyspnea at rest. He denied experiencing any chest pain or palpitations, as well. (*Id.*). The doctor observed that Peebles' gait was normal, and that he had an adequate range of motion in his extremities. Plaintiff said that he was familiar with normal cholesterol levels, and that he believed that his levels were elevated. (Tr. at 559). He stated that he walks ten minutes, daily, for exercise. (Tr. at 560). The doctor found that Plaintiff's A1C level had improved, but, nevertheless, concluded that his diabetes was not under control. (Tr. at 558). He likewise found that his hypercholesterolemia had improved, but that it was not controlled. Plaintiff's hypertension and coronary artery disease, however, were under control. (*Id.*). The doctor prescribed Hydrochlorothiazide to treat Plaintiff's pedal edema, and gave him educational literature

on proper diet, exercise, and pain management. (Tr. at 558, 560-61).

### *Educational Background, Work History, and Present Age*

At the time of the administrative hearing, Peebles was 62 years old. (Tr. at 60, 126). He had completed a general equivalency degree, and his past relevant work included his job as a truck driver. (Tr. at 20, 33-35, 236). He testified that he is unable to work as a truck driver, because he cannot obtain a commercial driver's license, due to his diabetes. (Tr. at 42).

### *Subjective Complaints*

In his applications for benefits, Plaintiff claimed that he was unable to work because of his diabetes, coronary artery disease, COPD, and high blood pressure. (Tr. at 235). He explained that, as a result of these conditions, he experiences dyspnea at rest, and on exertion. (Tr. at 224, 229). He said that he can walk only one hundred and fifty feet, before he must stop and rest. (Tr. at 229). He added that he must rest for three to five minutes before resuming. He also said that he can sit for only one to two hours, before his legs "go numb." (*Id.*). He denied experiencing any difficulty in attending to his personal care, and stated that he prepares simple meals, daily. (Tr. at 225, 226). Plaintiff stated that he performs housework, such as vacuuming, washing dishes, and cleaning counter tops, for approximately thirty minutes, daily. (Tr. at 226). He added that he goes outside two to three times each day. He claimed that he is able to drive independently, and that he shops for food, two to three times a month. (Tr. at 227). Peebles' activities include watching television, playing solitaire, and visiting his daughter and granddaughter. (Tr. at 228). He denied having any difficulty in cooperating with authority figures, and stated that he had never been discharged as a result of interpersonal conflict. (Tr. at 230).

Jennifer Peebles ["Ms. Peebles"], Plaintiff's daughter, claimed that he consistently

experiences numbness and tingling in his right arm, and that his legs "go out on him[.]" (Tr. at 258). She also said that he complains of "heartaches," and that he suffers from a critically high blood sugar level. (*Id.*). She explained that he "do[esn't] do much," aside from visiting her and her children. (Tr. at 259). Ms. Peebles stated that he "can barely walk, [and that he has] no strength in his arms." (*Id.*). She said that he has difficulty in dressing, bathing, and shaving. She added that he is depressed, and that he worries constantly. (*Id.*). She reported that she must remind him to take his medication, every morning, but that he prepares simple meals, daily. (Tr. at 260). Ms. Peebles claimed that he does not perform any household chores, and that he leaves his home only once or twice a week. (Tr. at 261). She said that he is able to drive, but that he is unable to engage in social activities. (Tr. at 261, 263). She stated that her father can stand or walk for five to ten minutes, and that he must then rest for fifteen minutes, before he can resume. (Tr. at 263). Ms. Peebles reported that her father can sit for only one hour, before the circulation in his legs deteriorates. (Tr. at 268). She added that he is able to follow spoken instructions, but that he has difficulty in following written instructions. (Tr. at 263). She also claimed that he does not handle stress well, and that she has never seen him so severely depressed. (Tr. at 264).

At the hearing, Peebles testified that he was diagnosed with diabetes in 2000, but that he "didn't do [any]thing about it until 2006." (Tr. at 42). He said that, in 2006, he sought treatment at the VAMC, and that he was prescribed several medications to treat his condition. (Tr. at 43). Plaintiff stated that he is no longer able to work as a truck driver, due to his diabetes. (Tr. at 42). He explained that he cannot obtain a commercial driver's license, because he is required to take insulin to control his glucose level. (Tr. at 42, 47). Peebles added that he cannot drive long distances, because of numbness in his legs when he sits for extended periods. (*See* Tr. at 46, 50). He claimed

that he can sit for one hour, only, before he must stand. (Tr. at 50). However, he said that if he stands or walks for too long, his legs begin to swell. (*Id.*). Plaintiff stated that, when he is at home, he lies down and elevates his legs to prevent the swelling. (*Id.*).

Peebles also testified that he began smoking tobacco at age 12. (Tr. at 50). He admitted that he continues to smoke one pack of cigarettes each day, despite his COPD. (Tr. at 44, 49). He said that he stopped smoking for eighteen months, but was unable to remain abstinent. (Tr. at 44). Plaintiff said that he experiences intermittent dyspnea, but denied having any chest pain. (Tr. at 51-52). He also denied using any illegal narcotics, and claimed that he had not done so since 2004. (Tr. at 44).

Plaintiff stated that he had been prescribed Lisonpril, to treat his high blood pressure; Zocor, to treat his high cholesterol; and insulin, Metformin, and Glipizide, to treat his diabetes. (Tr. at 48). He admitted that he does not take the Metformin as prescribed, because "it just tears [him] up." (*Id.*). He said that he also takes Aspirin. (*Id.*). Peebles told the ALJ that his daily activities consist primarily of watching television, retrieving the mail, and emptying the garbage. (Tr. at 49).

### *Expert Testimony*

The ALJ also heard testimony from Norman Hooge, a vocational expert witness. (Tr. at 35-36, 53-58). From his review of the record, as well as from the hearing testimony, Mr. Hooge described Peebles' prior work experience, as a truck driver, as "semi-skilled [labor,]" which required a medium level of physical exertion. (Tr. at 36). Following his summary, the ALJ posed a series of hypothetical questions to Mr. Hooge, to assess Peebles' residual functional capacity:

> Q   [] Assume a person limited to sitting six hours, standing and walking six hours, lifting and carrying 50 pounds occasionally, [and] 25 pounds frequently. The person needs to avoid dust, fumes, odors, pulmonary irritants. Occasional climbing [is permitted], but no climbing of ladders, ropes, or

scaffolds. [Is his] [p]ast work going to be available?

A    No, your honor. . . I would say that according to the DOT [he cannot] return [to] that [job]. Now according to the way he performed it in the economy, he could.

Q    Any transferrable skills from medium, semi-skilled job of truck driver to anything lighter?

A    The only transferability we have here [is to] the ['] deliverer of car rental['] [], but [that job] is light and [has a specific vocational preparation of ] three.[17] So that's a driving job.

* * *

A    [There are] [] 500 [car rental driver jobs in the region,] and nationally, well over 125.000.

(Tr. at 53-55). Plaintiff's attorney did not cross-examine the vocational expert.

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence. From his review of the record, he determined that Peebles has "coronary artery disease, diabetes mellitus, hypertension, and chronic obstructive pulmonary disease (COPD)[.]" (Tr. at 15). The ALJ further found that, due to these impairments, Peebles was unable to return to his former work as a truck driver. (Tr. at 22-23). However, he determined that Plaintiff has driving skills, which can be transferred to jobs within his residual functional capacity. (Tr. at 20). Ultimately, he concluded that Peebles is capable of working as a 'delivery car rental driver," and that a significant number of those jobs exist in the local, regional, and national economy. (Tr. at 20-21). For that reason, the ALJ determined that

---

[17]"Specific vocational preparation" ["SVP"] is the amount of time needed to learn the techniques, acquire the information, and develop the facility for average performance in a specific job-worker situation. SVP comes from vocational education, civilian, military, and institutional work experience, apprenticeship, and on-the-job training. An SPV of "three" means that the position requires the performance of "semi-skilled" duties. SKILLTRAN, http://www.skilltran.com/index.php/support-area/documentation/freq-counts/129-freq-counts-svp, (last visited July 12, 2017).

Peebles is "not disabled" under the Act. (Tr. at 21). With that conclusion, he denied Peebles' applications for benefits. (*Id.*). That denial prompted this request for judicial review.

Here, Plaintiff claims that the ALJ erred, at step five of his analysis, because he did not appropriately evaluate whether his commercial driving skills are transferrable to other work that exists in the national economy. (Plaintiff's Motion at 5). He argues, specifically, that "driving" is not a transferable skill. (*Id.* at 6-9). Peebles contends further that, even if "driving" is a transferable skill, he can no longer work as a commercial driver, due to his diabetes. (*Id*. at 7-9). He insists that, had the ALJ determined that he has no transferable skills, he would have been found disabled under the Medical Vocational-Guidelines. (*Id*. at 5-6). Peebles also contends that the ALJ erred, because he failed to determine whether his job skills could be transferred with "little or no adjustment in terms of tools, work processes, work settings, or industry." (*Id*. at 10-11). Plaintiff is adamant that he was prejudiced as a result of the ALJ's insufficient inquiry on that issue. (*Id*. at 11-15).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether the decision is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *Transferability of Skills*

The definition of "transferability," or skills that can be used in other work, is set out in 20

C.F.R. § 404.1568(d) as follows:

> (1) *What we mean by transferable skills.* We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

> (2) *How we determine skills that can be transferred to other jobs.* Transferability is most probable and meaningful among jobs in which–

>> (i) The same or lesser degree of skill is required;
>> (ii) The same or similar tools and machines are used; and
>> (iii) The same or similar raw materials, products, processes, or services are involved.

> (3) *Degrees of transferability.* There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable.

20 C.F.R. § 404.1568(d); *Jeffcoat v. Sec'y of Health and Human Servs.*, 910 F.Supp. 1187, 1194 (E.D. Tex. 1995). If an ALJ determines that an applicant possesses transferable skills, the acquired skills and the occupation to which those skills are transferable must be identified, expressly, in his opinion. SSR 82-41, Soc. Sec. Rep. Serv. 847.

The Medical-Vocational Guidelines ["Grid Rules"] provide additional restrictions on finding transferability of skills for applicants approaching retirement age (60-64), such as Plaintiff. For an ALJ to find that such an individual has skills transferable to a limited range of light work, there must be little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry. 20 C.F.R. Supt. P, App. 2, § 202.00(f). A claimant falling within this criteria is

presumed disabled, unless he has a "particularly" transferable skill or vocational set. *Sergent v. Astrue*, No. 10-CV-01041, 2011 WL 3299051, at \*9 (S.D. Tex. Aug. 1, 2011) (citing *Jeffcoat*, 910 F.Supp. at 1194). To rebut this presumption of disability, the ALJ must show that the plaintiff has "[transferable] individual skills, and/or an educational level, that would allow for direct entry into light or sedentary skilled work." *Id.*

Under the Regulations, a "transferable skill" refers to a "learned abilit[y] which combine[s] knowledge with coordinated physical movements, such as operating a typewriter, or a learned mental discipline, or an area of expertise." SSR 82-41, Soc. Sec. Rep. Serv. 847. An ALJ may not base a finding of transferability of skills on those aptitudes that are common to most people, such as "the ability to see, think, use judgment, or use one's hands." *Id.* In addition, "specialized truck driving" generally does not transfer to other work, because "basic driving ability is not a skill[.]" PROGRAM OPERATIONS MANUAL SYSTEM (POMS) DI 25015.017 TRANSFERABILITY OF SKILLS ASSESSMENT (TSA), https://secure.ssa.gov/apps10/poms.nsf/lnx/0425015017.

In this case, the ALJ relied on testimony from the vocational expert witness to determine that Plaintiff had "acquired work skills from past relevant work that are transferable to other occupations with jobs existing in [] the economy []." (Tr. at 20). The vocational expert testified that Plaintiff acquired the skill of "driving" while working as an "over the road truck driver." (*See* Tr. at 54). He testified further that Plaintiff could work as a "delivery car rental driver," because it is "a driving job." (*Id*.). Based on that testimony, the ALJ found that Peebles' truck driving skills are transferable to the position of "delivery car rental driver." (Tr. at 20). Unfortunately, however, it appears that the ALJ erred, because he made no findings in regard to the vocational adjustment required to transition from Plaintiff's previous work to that of a "delivery car rental driver." *See Sanders v. Astrue*, 4:12-

CV-2913, 2014 WL 6965038, at *11 (S.D. Tex. Dec. 8, 2014). He erred further in finding that Peebles' driving skills were transferable, because the Regulations clearly state that commercial truck driving is not a transferable skill. POMS, *supra*.

It is, nevertheless, true that Peebles' claim cannot succeed unless he shows that he was prejudiced by the ALJ's failure. *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton*, 209 F.3d at 459 (quoting *Hall*, 660 F.2d at 119 (5th Cir. 1981)). "If prejudice results from the violation, the result cannot stand." *Id*. In social security cases, a claimant establishes prejudice by showing that, absent the error, the ALJ might have reached a different conclusion. *See id.* at 453; *Ripley*, 67 F. 3d at 557 n.22. Here, the ALJ's step five finding that Plaintiff can perform other work in the economy is predicated on his determination that Plaintiff's commercial driving skills are transferable. (Tr. at 20). On this record, there can be no doubt that a different result might have been reached had the ALJ found that Plaintiff had no transferable skills, given his advanced age and education level. 20 C.F.R. Supt. P, App. 2, §§ 202.00(c), (f), 202.06 (stating that a finding of disabled is generally warranted for individuals of advanced age with a RFC for limited light work, who are unable to perform past work, and have non-transferable skills); *Sergent*, 2011 WL 3299051, at *8-9.

Moreover, Peebles testified that he cannot obtain a commercial driver's license, because he must take insulin to control his diabetes. (Tr. at 42, 46-47). The vocational expert witness pointed out that Plaintiff "can[not] get his [commercial driver's license] certification[,]" because of his condition. (Tr. at 54). Without that license, Peebles would be unable to work as a "delivery car rental

driver." Defendant argues that Plaintiff's diabetes cannot be a disabling impairment, because he has a history of non-compliance with his diabetic medication. (Response at 3). The Commissioner argues further that Peebles' blood sugar is stable when he takes his medication as prescribed. (*Id.*). However, there is no evidence to suggest that his diabetes would be controlled *without* insulin injections. Without medical records or medical expert testimony to show that insulin is not necessary to control Plaintiff's diabetes, the ALJ's step-five finding is not supported by substantial evidence.

In sum, the ALJ's decision to deny disability benefits to Peebles was not supported by substantial evidence, because he improperly found that Plaintiff's driving skills are a transferable skill, and he failed to consider what vocational adjustment, if any, is necessary to work as a "delivery car rental driver." In addition, the ALJ erred, because he failed to obtain medical evidence to show that Plaintiff's diabetes can be controlled without insulin. On this record, the ALJ's determination that Peebles is not disabled and his consequent denial of SSA benefits cannot be said to be supported by substantial evidence. For that reason, this case is remanded for further consideration of Plaintiff's ability to perform other work existing in the economy within his residual functional capacity.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.

It is further **RECOMMENDED** that the SSA's final decision should be **REMANDED**, under sentence four of 42 U.S.C. 405(g), with instructions to the ALJ to further develop the record as outlined in this memorandum.

The Clerk of the Court shall send copies of the memorandum and recommendation to the

respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at  Houston, Texas, this 3rd day of August, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**